## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **JOHN D. RUSSELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:07cv1011 SNLJ** |
| | ) | **TCM** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael Astrue, the Commissioner of Social Security ("Commissioner"), denying John D.

Russell disability insurance benefits ("DIB") under Title II of the Social Security Act ("the

Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI") under Title

XVI of the Act, 42 U.S.C. §§ 1381-1383b. Plaintiff has filed a brief in support of his

complaint; the Commissioner has filed a brief in support of his answer. The case was

referred to the undersigned United States Magistrate Judge for a review and recommended

disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

John D. Russell ("Plaintiff") applied for DIB and SSI in June 2005, alleging a

disability as of January 14, 2005, caused by pain in his neck, left leg, and back and by

surgeries on his neck, knee, and left leg. (R.[1] at 31-36, 80-82.) These applications were denied initially and after a hearing held in August 2006 before Administrative Law Judge ("ALJ") James B. Griffith. (Id. at 12-17, 23-29, 40-41, 61-65, 455-71.) After considering additional medical records, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-6.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that he is 6 feet tall and weighs approximately 205 pounds.[2] (Id. at 469-70.) He is married without children and lives with his wife. (Id. at 459.) He completed the tenth grade, and has had no other education or job-related training. (Id.) He took the General Equivalency Degree ("GED") test fourteen years ago, but did not pass. (Id.)

Plaintiff last worked on December 14, 2005.[3] (Id. at 460.) He had then worked thirteen years for the City of St. Louis in the forestry department. (Id.) He supervised the removal of debris from buildings and would run equipment, e.g., a wheel loader, dump truck, or farm tractor, if needed. (Id.) During some of the time he worked for the City, he also had

---

[1]References to "R." are to the administrative record filed by the Commissioner.

[2]Plaintiff was born on October 21, 1953. (Id. at 30.)

[3]This is clearly an error. Elsewhere Plaintiff listed "January 14, 2005" as the date he stopped working and his earnings record supports this earlier date.

a part-time job as a convenience store clerk.  (<u>Id.</u> at 460-61.)  And, he had done some factory

work and work as a stock clerk.  (<u>Id.</u> at 461.)  Problems with his neck, back, and leg prevent

him from working again.  (<u>Id.</u> at 462.)  He cannot sit for longer than thirty minutes before

having to get up or change position.  (<u>Id.</u> at 467.)  He cannot stand for longer than thirty to

forty-five minutes before having to rest.  (<u>Id.</u> at 467-68.)  And, he cannot walk farther than

one or two blocks before having to stop and rest.[4]  (<u>Id.</u> at 468.)

After neck surgery in 2003 or 2004, he has a lot of neck pain and has difficulties

turning his neck.  (<u>Id.</u> at 462.)  The pain is constant, but varies in intensity.  (<u>Id.</u>)  On a scale

of one to ten, with ten requiring a trip to the emergency room for immediate treatment, his

neck pain is a six at its lowest and an eight or nine at its highest.  (<u>Id.</u> at 462-63.)  Being

active and doing such things as driving or lifting increases the pain.  (<u>Id.</u> at 463.)  If he takes

medication, the pain drops to a six.  (<u>Id.</u>)  He has had the pain since a car accident in 1990

or 2003.  (<u>Id.</u>)

He has back pain whenever he bends over or walks for any distance.  (<u>Id.</u> at 463.)  The

pain is in his lower and upper back and averages a six or seven on a ten-point scale.  (<u>Id.</u> at

464.)  Medication and soaking in a Jacuzzi help relieve the pain.  (<u>Id.</u>)  He has had this pain

also since the accident.  (<u>Id.</u>)

---

[4]Plaintiff had earlier testified that if he stands for a few hours or walks for longer than an hour, his right leg hurt.  (<u>Id.</u> at 465.)  He later explained that he had misunderstood the question.  (<u>Id.</u> at 468.)

Plaintiff's neck and back pain make it difficult for him to sleep well.  (Id. at 468.)  He has to get out of bed and sit for awhile.  (Id.)  A good night is when he gets four to five hours of sleep.  (Id.)

Plaintiff also has problems in his legs, which are usually worse in the left leg.  (Id.)  The pain is in his foot and knee.  (Id.)  If he stands too long, his foot swells.  (Id.)  The pain is constant in the left leg, but varies in intensity depending on how much he moves around.  (Id. at 465.)  At its worst, the pain is an eight; at its best, it is a four.  (Id.)  Medication and elevation of the leg help relieve the pain.  (Id.)  He has had leg pain all his life.  (Id.)  In 1963, he had a bilateral osteotomy on both legs.[5]  (Id. at 466-67.)  In 1986, he was treated for thromboplebitis.  (Id. at 467.)  And, in 1997, his right knee was reconstructed.  (Id.)

Plaintiff takes three medications: oxycodone, Actium, and cyclobenzaprine.[6]  (Id. at 466.)  Their only side effect is a slight sleepiness.  (Id.)  He has discussed this side effect with his doctor, but the dosages have not been changed.  (Id.)

Plaintiff further testified that he had had a prosthetics appointment for support pads for his shoes.  (Id. at 466.)

Plaintiff smokes a pack of cigarettes a day.  (Id. at 465-66.)  He is able to take care of his personal needs, including dressing himself.  (Id. at 468-49.)  A typical day begins at

---

[5]Osteotomy, or bone cutting, is a surgical technique used to correct pigeon toes in children who have not outgrown the problem by the time they are ten years old.  Univ. of Cal. at S.F., Pediatrics: Torsion, http://orthosurg.ucsf.edu/public_site/sindex.cfm?page_ID=pediatrics &article_ID=55 (last visited July 31, 2008).

[6]This is mistakenly spelled "cyclodensiprine" in the transcript.  (See R. at 215, 216, 217 for correct spelling.)

6:30 in the morning when he gets up and has a cup of coffee.  (Id. at 469.)  He'll then watch television and, occasionally, will read the newspaper or a book.  (Id.)  His wife does all the household chores.  (Id.)

At the conclusion of the hearing, the ALJ asked counsel if the record was complete. (Id. at 470.)  Counsel replied that it was.  (Id.)

<h3 style="text-align:center"><strong><u>Medical and Other Records Before the ALJ</u></strong></h3>

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from various health care providers and from a consultant, and the answers of a vocational expert to interrogatories.

When applying for DIB and SSI, Plaintiff completed a Function Report.  (Id. at 114-21.)  He described his typical day as having breakfast and coffee, watering the garden, watching television until lunch, taking a nap, having supper, and then, sometimes, visiting friends.  (Id. at 114.)  He can only mow the lawn if he does a little at a time.  (Id. at 116.) His wife does the housework and prepares the meals.  (Id. at 116, 117.)  He can walk for only ten minutes before having to rest for five to ten minutes.  (Id. at 118.)  He has no difficulty paying attention or following instructions.  (Id.)

Plaintiff's wife, Janet Russell, also completed a Function Report on his behalf.  (Id. at 105-13.)  She had known him for twenty-three years.  (Id. at 105.)  She described his daily activities as watering the garden after breakfast and taking care of the flowers; eating lunch; taking a nap after lunch; and watching television or visiting friends after dinner.  (Id.)  He

helps feed and take care of their three dogs.  (<u>Id.</u> at 106.)  He used to be able to do a variety of tasks from mowing the grass to bringing in groceries that he can no longer do.  (<u>Id.</u>)  He does not sleep well because he is constantly waking up in pain.  (<u>Id.</u>)  He has no problem taking care of his personal needs.  (<u>Id.</u>)  She prepares all the meals and takes care of the indoor chores.  (<u>Id.</u> at 107-08.)  They shop every week and visit friends.  (<u>Id.</u> at 108-09.)  Plaintiff used to enjoy hiking and fishing but can now do neither often.  (<u>Id.</u> at 109.)  He can lift only five pounds, sit for only an hour, stand for only thirty minutes, and walk for only ten minutes before needing to rest.  (<u>Id.</u> at 110.)  He has no problem following instructions and has a good attention level.  (<u>Id.</u>)

Plaintiff listed two jobs on an Work History Report.  (<u>Id.</u> at 130-38.)  The longest-held job was as a labor foreman in the forestry department from March 1993 to January 2005.  (<u>Id.</u> at 130.)  This job required that he frequently lift fifty pounds and walk, stand, sit, climb, knee, crouch, and crawl for an hour each.  (<u>Id.</u> at 131.)  He also had to handle big and small objects.  (<u>Id.</u>)  He supervised five to fifteen people; most of his time was spent in supervision.  (<u>Id.</u>)  His other job was as a convenience store clerk ("7-11") from July 1990 to March 1993.  (<u>Id.</u> at 130.)  This job required that he frequently lift twenty-five pounds.  (<u>Id.</u> at 132.)  Plaintiff did not list any other exertional requirements.  (<u>Id.</u>)

On another form, Plaintiff reported that his impairments first bothered him in July 1993 and prevented him from working on January 14, 2005.  (<u>Id.</u> at 139.)  That was when the pain became so bad that he could no longer work.  (<u>Id.</u>)  On this form, Plaintiff reported that he did not supervise other people when working as a foreman.  (<u>Id.</u> at 139-40.)  He listed

his health care providers, two of whom he saw for his neck in 2003. (Id. at 141-42.) The provider he had seen the longest, from 1997 to 2004, was Simeon Pager, M.D. (Id.) His only medications were prescribed by Dr. Pager; only one, Tylenol with codeine, had a side effect, i.e., sleepiness. (Id. at 143.) Plaintiff also noted that his attorney had all his medical records. (Id. at 142.) He had firefighting training when in the Marines. (Id. at 144.)

Plaintiff's earnings record reflects reported income for the years from 1969 to 2005, inclusive, with no gaps and usually in increasing amounts. (Id. at 68.) In 2004, his last full year of income, he earned $37,116.98; in 2005, he earned $3,785.46. (Id.)

On an undated form requesting information about recent medical treatment, Plaintiff listed monthly visits to a health care provider at the Veterans' Administration Medical Center ("VAMC") from December 2005 to March 2006, inclusive, and a prosthetics appointment in March 2006. (Id. at 92.)

On another undated form, Plaintiff reported that there had been no change in his condition since his last report in June 2005. (Id. at 95.) He was currently taking ibuprofen for pain and Nortriptyline for depression. (Id. at 96.)

The medical records before the ALJ begin in 1998 with the reports of a chest x-ray taken on November 3. (Id. at 286.) It was normal. (Id.) A ventilation-perfusion scintigraphy indicated that Plaintiff had a low likelihood of pulmonary embolism. (Id. at 287.)

On January 21, 1999, Plaintiff went to a clinic at Barnes Jewish Hospital ("BJH") after injuring his jaw in a fall when he was assaulted. (Id. at 288.) Records from BJH the

following month list a diagnosis of "[v]aricose veins and a history of superficial thrombophlebitis" in his left leg.  (Id. at 290.)  Consequently, Plaintiff underwent surgery to have a vein in his left leg stripped.  (Id. at 289-90.)  An exam in July 2003 using a color flow duplex imager showed no evidence of deep vein thrombosis in either leg.  (Id. at 306.)  From April 1999 to July 1999, Plaintiff was treated for hepatitis C.  (Id. at 291-95.)  It was later described as cured.  (Id. at 302.)

Plaintiff's next medical record is from March 28, 2003, when he sought medical attention at the Concentra Medical Center ("CMC").  He was driving a truck when it was hit on the side by another vehicle.  (Id. at 204-05.)  His neck was hurt.  (Id.)  An x-ray of his cervical spine showed no clear evidence of fracture but did reveal an old compression at C6 with associated degenerative disease.  (Id. at 201.)  He was to participate in physical therapy three times a week for one to two weeks.  (Id. at 204-05.)  On April 2, 4, 7, 9, 14, 17, 22, and 25, Plaintiff returned to the CMC for physical therapy for his neck pain and, on some of those days, for rechecks of his injury.  (Id. at 217-254.)  It was noted at his April 2 visit that he had been compliant taking medication, was doing his home exercises, and felt better.  (Id. at 221.)  There was still pain in his right lower neck.  (Id.)  The diagnosis was cervical strain. (Id.)  On April 4, he reported that he had had to turn his neck a lot the day before and it was very sore.  (Id. at 227.)  His range of motion in his neck was limited by 25 to 30%.  (Id.)  At the next visit, on April 7, the range of motion in extension was limited by pain to 75%.  (Id. at 232.)  His pain was worse.  (Id.)  Two days later, he reported that different medications were helping the pain, although he continued to have difficulties with extension.  (Id. at 235.)

He was on restricted duty at work.  (Id.)  An x-ray of his cervical spine on April 23 revealed "broad-based disc herniation at C4-5, C5-6, and C6-7, with large right sided cord compression at the C6-7 level."  (Id. at 251.)  Two days later, he was referred to a neurosurgeon.  (Id. at 254.)

On May 7, Plaintiff consulted a neurosurgeon, David G. Kennedy, M.D., with the Missouri Baptist Medical Center about his cervical pain.  (Id. at 191-92.)  An x-ray of his cervical spine on May 19 revealed degenerative disc disease.  (Id. at 149.)  A myelogram that same day showed stenosis at C5-C6 and C6-C7 and a "nonfilling of the right C7 nerve root sleeve consistent with a large disc herniation."  (Id. at 150-51.)  A computed axial tomography ("CT") scan of his cervical spine showed a central protrusion at C4-C5 and generalized degenerative changes.  (Id. at 152-53.)

The next month, on June 5, Plaintiff had a chest x-ray before undergoing surgery; it revealed no evidence of acute cardiopulmonary disease.  (Id. at 158-59.)  The preoperative and postoperative diagnoses were "[h]erniated nucelus pulposus and cervical spondylosis with spinal stenosis and radiculopathy, C5-6 and C6-7" and "[c]ervical disk herniation with spinal stenosis and foraminal stenosis, C5-6, C6-7."  (Id. at 162, 165.)  The admission notes for his June 12 surgery report that Plaintiff had declined a nonoperative intervention for his cervical pain.  (Id. at 170.)  Either he or a family member had had adverse reactions to cervical traction.  (Id. at 170, 193.)  His medical history included corrective leg surgery in 1962, shoulder reconstruction surgery in 1986, reconstructive surgery of his right knee in 1998, and a vein stripping of his left leg in 1998.  (Id.)  The surgery included a complete

diskectomy, microdissection, anterior cervical fusion, and anterior cervical plating at C5-C6 and C6-C7.  (Id. at 165.)  At discharge the next day, Plaintiff was described as "doing well." (Id. at 167.)  The pain in his arm had "much improved" and his strength was intact in his arms and hands.  (Id.)  He was to follow up with Dr. Kennedy in two weeks.  (Id. at 171.)

Plaintiff saw Dr. Kennedy again on June 17.  (Id. at 194.)  He reported that he had had some numbness in the fourth and fifth fingers of his left hand.  (Id.)  Dr. Kennedy opined that mild epicondylitis was irritating Plaintiff's ulnar nerve and that the numbness was not related to his cervical radiculopathy.  (Id.)  He further opined that, after the fusion matured, anti-inflammatories would be considered for the elbow symptoms if they persisted.  (Id.)  X-rays taken of his cervical spine revealed normal alignment.  (Id. at 173.)

Plaintiff returned to Dr. Kennedy on July 1.  (Id. at 195.)  He was doing better and not having much arm pain.  (Id.)  Dr. Kennedy told him he could stop wearing the cervical collar, but should lift no more than ten pounds.  (Id.)  He was to return in six weeks and was to remain off work in the interim.  (Id.)  X-rays revealed noted that the soft tissue swelling was "markedly improved."  (Id. at 174.)  There was no change in the alignment.  (Id.)

Two days later, Plaintiff was in a car that was hit from behind.  (Id. at 196.)  He went to the emergency room with complaints of neck pain.  (Id. at 175-86.)  X-rays of his cervical spine showed no changes from the ones taken on July 1.  (Id. at 179, 305.)  It was noted that he was medicating himself with Flexeril (cyclobenzaprine) and Vicodin.  (Id. at 181, 183.) He was discharged with instructions to follow up with his surgeon as scheduled or return to the emergency room if worse.  (Id. at 175.)

Plaintiff returned to Dr. Kennedy on August 12. (Id. at 197.) His range of motion was slightly decreased. (Id.) He was to start physical therapy, take no more than one Vicodin every ten to twelve hours, and return in six weeks. (Id.) X-rays of his cervical spine were as expected with the plate and bone graft material being appropriately positioned. (Id. at 187.) Plaintiff did return on September 24. (Id. at 1999.) He had occasional pain. (Id.) His range of motion was improved, with the exception of "some slight limitation with flexion." (Id.) His strength was intact. (Id.) He was at maximum medical improvement and could return to work without restrictions. (Id.) X-rays were as expected, revealing the diskectomy and fusion to be unchanged. (Id. at 188.)

In addition to the medical care for his accident-related injuries, Plaintiff consulted Dr. Pager on January 6, 2003, and again on April 14 for persistent rhinitis. (Id. at 301-04.) A prescription for Flonase was given at the second appointment. (Id. at 304.)

On July 21, he returned to Dr. Pager after having swelling in his left leg for approximately one week. (Id. at 306-12.) It was noted that he had been taking Coumadin for one to two years until it was stopped in 2000. (Id. at 312.) He had also been taking Niaspan for low HDL cholesterol, but had unilaterally stopped. (Id.) Dr. Pager encouraged him to restart the Niaspan and scheduled him for various tests to determine whether he had a recurrence of deep vein thrombosis. (Id.) The test revealed he did not. (Id. at 306.) He also did not have lupus. (Id. at 308, 311.) The next week, Plaintiff reported that the swelling had decreased. (Id. at 313.) As directed, he was again taking Niaspan. (Id. at 313.) There

was no need to restart the Coumadin, and the swelling in his left foot could be treated with warm soaks, elevation, and, if needed, Advil or Aleve.  (Id.)

In October, Plaintiff consulted Dr. Pager about skin lesions on his forearms.  (Id. at 314.)  His neck pain had improved but was not resolved.  (Id.)

Plaintiff injured his back on March 11, 2004, when the car he was driving was hit in the rear when stopped at a light.  (Id. at 256, 258, 261.)  He suffered severe, immediate pain in his back and neck and described the pain as aching and stabbing.  (Id. at 261.)  The pain did not radiate, but was exacerbated by movement.  (Id.)  He also had a headache.  (Id.)  The diagnosis was lumbar and cervical strain.  (Id.)  He was prescribed Flexeril and Ibuprofen and was to be scheduled for physical therapy three times a week for two weeks.  (Id. at 259, 263.)  Maximum medical improvement was expected in two weeks.  (Id. at 259.)  Until then he was on restricted duty and was not to lift anything heavier than fifteen pounds.  (Id. at 259-60)  He reported on March 15 that he had been taking his medication, although the effects of the ibuprofen wore off after four hours, and he felt 25% better.  (Id. at 256.)  He continued to have lower back and neck pain.  (Id.)  He had not yet been scheduled for physical therapy.  (Id.)

On March 18, he began physical therapy and was given a home exercise program.  (Id. at 266-68.)  At the next therapy session, on March 22, he reported "feeling much improved" on the medication and with the home exercises.  (Id. at 270-72.)  Two days later, Plaintiff reported that he was making progress daily.  (Id. at 274.)  His only remaining restriction was not to lift more than ten pounds, but this restriction was "not different than

his full duty job." (Id.)  His neck pain, however, was a seven on a ten-point scale and his back pain was a six.  (Id.)  He demonstrated a full range of motion in his lumbar spine and had no guarded posture or compensating movements.  (Id.)  He continued to be limited in his cervical range of motion.  (Id.)  At the next session on March 26, Plaintiff said he was back to his preinjury status.  (Id. at 277.)  His neck pain was a seven; his back pain was a five. (Id.)

Plaintiff had his last physical therapy appointment on March 30.  (Id. at 282-85.)  He had a 100% range of motion in his lower back and a 50% range in his neck.  (Id. at 285.) This limited range was what it was before his injury.  (Id.)  His back pain was a five.  (Id.) He was released at his medical appointment the same day to return to his regular activity. (Id. at 279.)  At that appointment, he reported being at least 90% better.  (Id. at 280.)  He explained that he worked as a foreman and did not need any restrictions.  (Id.)

On June 17, Plaintiff returned to Dr. Pager with complaints of bright red blood in his rectum.  (Id. at 315-17.)  He did not feel that he had recovered from his automobile accidents.  (Id. at 315.)  His blood pressure was elevated and was to be rechecked in one month.  (Id.)  A colonoscopy revealed polyps that presented no complications and was otherwise normal.  (Id. at 296-00, 319-23.)

The next month, Plaintiff complained to Dr. Pager of neck pain.  (Id. at 324.)  The pain was a seven on a ten-point scale, and he was frequently fatigued.  (Id.)  He was not on any chronic pain medication.  (Id.)  His high blood pressure had resolved.  (Id.)  Dr. Pager discussed epidural steroid injection or nerve root injections for his neck pain; Plaintiff did

not want to undergo any additional medical procedures.  (Id.)  He was encouraged to stop smoking and was to return in two months, at which time treatment for depression and/or chronic pain would be considered.  (Id.)

When Plaintiff did return, on September 23, he continued to complain of severe neck pain that was a seven.  (Id. at 325-26.)  He reported that Dr. Kennedy had told him that there was nothing more that he could do for him.  (Id.)  The neurologic exam was normal.  (Id.)  He was given medication and the choice of talking to a physiatrist about steroid injections or going to another neurosurgeon for a second opinion.  (Id.)  He was again encouraged to stop smoking.  (Id.)

Pursuant to his DIB and SSI applications, Plaintiff was evaluated by Bobby Enkvetchakul, M.D., in September 2005.  (Id. at 329-33.)  He complained of intermittent swelling in his left leg; decreased strength in both legs, preventing him from walking far and making it difficult for him to rise from a squatting position; decreased mobility in his cervical spine; headaches; pain in the cervical region, primarily over the posterior aspect; and pain in his low back that did not radiate to his legs.  (Id. at 333.)  He reported that he last worked on January 14, 2005, and that subsequent job applications have not been successful.  (Id.)  Dr. Enkvetchakul observed that Plaintiff rose from a seated position without help and got on and off the examination table without assistance.  (Id.)  He walked with "an easy stride" and without a limp.  (Id. at 332.)  He was able to rise up on his toes and rock back on his heels.  (Id.)  He had a full range of motion in his lumbar spine with forward flexion at his waist and side bending of 20°, although he complained of pain with the testing.  (Id.)  His deep tendon

reflexes of the lower extremities were 1+ at his knees and ankles; strength was normal in those extremities. (Id.) His seated straight leg raise was negative to 90° for any radicular complaints. (Id.) Supine straight leg raises to 60° or 70° produced complaints of back pain. (Id.) He had a very limited range of motion in his cervical spine, although it was unclear whether he "would not or could not move his neck any further" than the 30° to 40° range exhibited. (Id.) No muscle spasms were detected. (Id.) In his upper extremities, there was no evidence of atrophy, his deep tendon reflexes were symmetrically diminished, and his grip strength was weak bilaterally.[7] (Id.) "There did appear to be poor effort with manual muscle testing in the upper extremities." (Id.) With the exception of some faint scars, his right knee was normal. (Id.) There was no leg length discrepancy and, other than some scars, no deformities in his left leg. (Id.)

Dr. Enkvetchakul further noted that:

[Plaintiff] is status post a cervical fusion and therefore he may have some residual cervical pain as a result of this procedure, but certainly on examination today, he does not have any evidence of any neurologic compromise. Similarly, for the low back, his complaints of pain are diffuse and non-localizing and are more likely to be just mechanical in nature. He does have signs of symptom magnification, particularly with his low back complaints. There was no evidence on today's examination of any type of lower extremity radiculopathy or neural compromise. . . .

(Id.)

Dr. Enkvetchakul diagnosed status post cervical fusion; back pain; and history of tibial osteotomies to correct pigeon toes. (Id.) He concluded that there was "no objective

_____

[7]Elsewhere in his report, Dr. Enkvetchakul described the grip strength as 4, with 5 being the maximum. (Id. at 330.)

evidence for any type of work restrictions," other than the typical restriction of not lifting anything heavier than fifty pounds which is imposed after his cervical procedure. (Id. at 331.) He considered Plaintiff's complaints to be "primarily subjective in nature without any significant objective findings." (Id.) Plaintiff could sit during a normal eight-hour workday "given the unusual breaks" and had no restrictions in standing or walking. (Id.) He might, however, have difficulty looking up or doing work above his head. (Id.) Although he might not be able to engage in long periods of travel, he could get himself to and from work. (Id.) His medication precluded him from engaging in "any safety-sensitive type duties." (Id.)

The ALJ also had before him a Physical Residual Functional Capacity Assessment of Plaintiff completed by an agency counselor in September 2005 and listing his only diagnosis as status post-cervical diskectomy/fusion. (Id. at 122-29.) His impairments resulted in exertional limitations of being able to occasionally lift fifty pounds, frequently lift twenty-five pounds, and sit, stand, or walk about six hours in an eight-hour workday. (Id. at 123.) He had an unlimited ability to push or pull. (Id.) He had no postural, visual, or communicative limitations. (Id. at 124-26.) He had one manipulative limitation: he was limited in his ability to reach overhead. (Id. at 125.) He had environmental limitations of a need to avoid concentrated exposure to extreme cold, vibrations, or hazards such as heights and machinery. (Id. at 126.)

After the administrative hearing, the ALJ forwarded interrogatories to a vocational expert ("VE"), Jeffrey F. Magrowski, Ph.D.[8] (Id. at 87-89.) Dr. Magrowski had reviewed Plaintiff's file and, in response to a question about of Plaintiff's past work, answered that the exertional level of his job as a gas station attendant (working for "7-11"), as described by Plaintiff, was medium and of his job as a utility worker/supervisor was heavy. (Id. at 87.) According to the Dictionary of Occupational Titles ("DOT"), 915.477-010 ("Automobile-Self-Service-Station Attendant"), the skill level of the job of gas station attendant was semi-skilled and that of a utility worker/supervisor was skilled. (Id.) Both jobs provided Plaintiff with transferable skills. (Id. at 88.) Specifically, the job as a gas station attendant provided him with cashiering and customer service skills and the job as a utility worker/supervisor provided him with equipment operation and supervision skills. (Id. at 88.) Dr. Magrowski answered "yes" to the question whether a person with the following RFC would perform any of Plaintiff's past work:

> . . . [A] worker able to lift and carry 50 pounds occasionally, 25 pounds frequently, who can stand and/or work for up to 6 hours in an 8-hour workday (assuming the normal breaks), who can sit for up to 6 hours in an 8-hour workday (assuming the normal breaks), who can engage in occasional overhead reaching, who should avoid concentrated exposure to extreme cold, vibration and hazards (such as unprotected heights and dangerous machinery).

(Id.) The job Plaintiff could perform would be that of a gas station attendant. (Id.)

---

[8]Plaintiff's counsel had no objection to the interrogatories and no response to the answers. (Id. at 85-86, 90.)

## The ALJ's Decision

After first finding that Plaintiff had not engaged in substantial gainful activity at any relevant time,[9] the ALJ addressed his claims of a disabling musculoskeletal impairment. (Id. at 13.) The ALJ noted that the medical record failed to disclose any ongoing medical care sought or received by Plaintiff after January 14, 2005. (Id.) The record did include Dr. Enkvetchakul's report and evaluation, which the ALJ summarized in detail. (Id. at 13-14.) Based on that report, the ALJ concluded that Plaintiff had impairments consistent with Dr. Enkvetchakul's diagnosis: status post cervical fusion; back pain; and history of tibial osteotomies as a child. (Id. at 14.) The ALJ further concluded that, although one or more of these impairments was severe, none, considered singly or combination, met or equaled an impairment of listing-level severity. (Id.)

The ALJ next addressed Plaintiff's allegations about the effect of his impairments on his ability to perform work. (Id. at 14-15.) He found those impairments to be "not fully credible" under the factors outlined in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1884) (subsequent history omitted). (Id. at 14.) Detracting from that credibility were the lack of any statement by a physician that he was unable to work; the lack of any ongoing medical care, particularly during his period of disability; and his ability to engage in a variety of daily activities, including caring for pets, doing outdoor chores, shopping, driving, and, occasionally, fishing and hunting. (Id. at 14-15.)

_____

[9]See pages 22 to 25 for a discussion of the Commissioner's five-step procedure for evaluating DIB and SSI claims. The first step is determining whether the claimant is engaged in substantial gainful activity.

The ALJ found that, based on the entire record and placing great weight on Dr. Enkvetchakul's assessment, Plaintiff was able to lift or carry fifty pounds occasionally and twenty-five pounds frequently. (Id. at 15.) He could stand, walk, or sit for six hours in an eight-hour workday, assuming normal breaks. (Id.) He could occasionally reach overhead, but should avoid concentrated exposure to cold, vibration, and hazards. (Id.) With this residual functional capacity, Plaintiff could perform his past relevant work as a gas station attendant as that job is ordinarily performed in the national economy. (Id. at 15-16.) He was not, therefore, disabled within the meaning of the Act. (Id. at 16.)

## Additional Medical Records Before the Appeals Council

The Appeals Council had before it Plaintiff's medical records from the VAMC from December 2005 to through February 2007.

On December 15, 2005, Plaintiff was seen by Dr. Gail L. Birkenmeier at VAMC for complaints of headaches, back pain, neck pain, and right shoulder pain. (Id. at 443-45.) His upper extremities felt weak. (Id. at 443.) These symptoms had been present, and had not changed, for approximately six months. (Id.) He explained that he had not been seen by his former physician, Dr. Pager, for more than a year because he had lost his insurance. (Id.) He did not have any medical records with him. (Id.) He was taking Tylenol with codeine #3. (Id.) Plaintiff's prescription for Tylenol with codeine #3 was renewed and he was to have lab work done and x-rays taken. (Id.)

Plaintiff returned to Dr. Birkenmeier on January 17, 2006. (Id. at 437-442.) He reported that he was not sleeping well because of the neck pain and was constantly nervous.

(Id. at 438.)  The Tylenol with codeine #3 was not effective.  (Id.)  A depression screen was negative.  (Id.)  His medication was changed to Tylenol with codeine #4.  (Id.)  He smoked two packs of cigarettes a day, but was planning on quitting within the next six months.  (Id. at 440.)

On February 7, Plaintiff was evaluated for hepatitis C.  (Id. at 375-76, 435-36.)  There was no detectable virus.  (Id. at 375, 435.)  At the exam, he was alert and oriented to time, place, and person, and he walked and moved easily.  (Id.)  His prescription for Tylenol with codeine was reportedly not helping his neck pain; the prescription was changed to Percocet. (Id. at 433.)  Flexeril was added back to his medication regime.  (Id.)

In March, Plaintiff was fitted with gel shoe inserts.  (Id. at 369-70, 429.)

On April 10, Plaintiff reported that a combination of oxycodone and cyclobenzaprine was relieving his pain.  (Id. at 428.)  Plaintiff requested refills of his prescriptions for oxycodone and cyclobenzaprine on June 13, September 5, and October 3.  (Id. at 415-25.) The medications were mailed to him.  (Id.)

Plaintiff consulted the health care providers at the VAMC on October 6 after developing a right inguinal hernia.  (Id. at 366.)  He had noticed it after lifting a propane tank at home.  (Id. at 366, 403, 413.)   A surgical repair with mesh was recommended, and Plaintiff agreed.  (Id. at 368.)  Plaintiff was admitted for the surgery on October 22 and he had the repair done soon thereafter.[10]  (Id. at 396-413, 446-51.)

---

[10]Some records indicate the surgery was on October 23, some on October 24.

Plaintiff telephoned on November 9 for a reorder of his prescriptions for oxycodone and cyclobenzaprine.  (Id. at 394.)  It was noted that he had not yet been seen by his new physician and would need to be before the prescriptions were renewed.  (Id.)

On December 8 Plaintiff saw Dr. Mohammad Qadir after Dr. Birkenmier reduced her clinic time.  (Id. at 388-93.)  He reported that the inserts were not helping his feet.  (Id. at 389.)  He walked without a gait and in no apparent distress.  (Id. at 390.)  He had pain when raising his shoulders and when moving his neck.  (Id.)  Plaintiff was to have his urine tested.  (Id. at 388.)  He did not.  (Id.)  He was told on December 13 that there would be no further oxycodone reorders until he had the lab work as ordered.  (Id. at 387.)

On February 6, 2007, Plaintiff called for a renewal of his oxycodone and cyclobenazapirne.  (Id. at 385.)  Plaintiff was informed by telephone on February 8 that his pain medication would not be renewed until he had lab work done.  (Id. at 384.)  Plaintiff was upset and explained that he could not drive 160 miles only for lab work and would have to have it done the day of his appointment.  (Id.)  He also explained that over-the-counter medications did not help.  (Id.)  A CT scan of Plaintiff's cervical spine on February 26 showed "[s]tatus post fusion C5 through C7 vertebral bodies with metallic plate and screws and bone graft" and "[m]ild posterior osteophytes at multiple levels."  (Id. at 337-38.)  X-rays of his cervical spine also showed the post-fusion changes.  (Id. at 340.)  Chest x-rays showed no abnormalities in his heart or lungs.  (Id. at 338-39.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the

ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl</u> <u>v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing <u>Polaski</u>, 739 F.2d at 1322). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** <u>See</u> <u>also</u> **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

Also at step four, after an ALJ has assessed a claimant's RFC the ALJ will then "find that a claimant is not disabled if he retains the RFC to perform" the functional demands and job duties of his past relevant work as he actually performed them or as they are "generally required by employers throughout the national economy." **Wagner v. Astrue**, 499 F.3d 842,

853 (8th Cir. 2007).  An "ALJ may elicit testimony from a [VE] in evaluating a claimant's capacity to perform past relevant work."  **Id.**

The burden at step four remains with the claimant.  **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.

If the claimant cannot perform his past relevant work, the Commissioner must determine at step five whether the claimant can perform any other kind of work.  **Hepp v. Astrue**, 511 F.3d 798, 803 n.4 (8th Cir. 2008).  The burden shifts to the Commissioner at this step.  **Steed**, 524 F.3d at 875 n.3.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole."  **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision."  **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (internal quotations omitted).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely because substantial evidence would also support an

opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Specifically, the ALJ erred (a) when assessing his credibility, misjudging his daily activities, failing to consider the records of his treatment at the VAMC, failing to secure those records although having notice of them, and not considering his good work record and military service, and (b) when assessing his RFC, such RFC not having support in the medical record.  The Court will address the second claim of error first.

The ALJ's assessment of Plaintiff's RFC included a restriction of being able to engage in "occasional overhead reaching."  This restriction was included in the hypothetical question posed to the VE.  Dr. Enkvetchakul concluded that Plaintiff "may" have trouble looking up or doing work above his head.  The agency counselor concluded that Plaintiff was limited in his ability to reach overhead.  The VE opined that, with this inability to engage in more than occasional overhead reaching, Plaintiff could return to his past relevant work as a gas-station attendant.  As noted above, the functional demands and job duties of a particular

position can be based on the work as actually performed by a claimant or on the definition of that job in the DOT.[11]  See **Wagner**, 499 F.3d at 853.

In the instant case, however, Plaintiff listed only one requirement of his work as a *convenience store clerk*: a need to frequently lift twenty-five pounds.  Consequently, his ability to return to his past relevant work cannot be assessed in the context of that work as he actually performed it.

The DOT lists as requirements for a gas station attendant (a) frequent reaching, i.e., 1/3 to 2/3 of the time, and (b) frequent exposure to weather.[12]  The ALJ concluded, however, that Plaintiff did not have the RFC to engage in frequent overhead reaching.  The record is silent whether the reaching required for a job as a gas station attendant is overhead.  A silent record on a crucial exertional limitation does not give the ALJ's decision the necessary support in the record.  Cf. **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007) (finding that a case need not be remanded because of an ALJ's failure to address the question whether a claimant can perform his past relevant work as generally performed in national economy if the failure was not prejudicial).  Consequently, the case must be remanded for development of the record on the requirements of Plaintiff's past relevant work and, if necessary, for

---

[11]The DOT is properly considered "a resource in determining the duties of a claimant's past relevant work."  **Samons**, 497 F.3d at 821.

[12]These requirements are the same regardless of whether the gas station is self-serve.  See DOT 915.467-010 (not self-serve), 915.477-010 (self-serve).

testimony from a VE about whether there is other work in the national economy that Plaintiff can perform.[13]

Plaintiff also argues that the ALJ erred by discounting the credibility of his complaints when assessing his RFC. The ALJ cited three specific factors detracting from Plaintiff's credibility: his daily activities; the lack of any restrictions placed on him by physicians; and the lack of any medical treatment during the alleged onset of disability.

It is well established in the Eighth Circuit that "a claimant 'need not be bedridden in order to be unable to work.'" **Wagner**, 499 F.3d at 851(quoting Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007)). Conversely, an ability to perform a wide range of activities is inconsistent with allegations of disabling pain. See **Hepp v. Astrue**, 511 F.3d 798, 807 (8th Cir. 2008).

The ALJ cited Plaintiff's activities of caring for his pets, doing outdoor chores, shopping, driving, and, occasionally, fishing and hunting as inconsistent with his allegations of disabling pain. The amount of effort involved in the first activity is unexplained. Caring for the dogs could be as simple as putting out food and water for them or as demanding as regularly walking all three. The outdoor chores are watering the garden and mowing. The mowing is done a little at a time and, if a lot of mowing is required, is done by his brother-in-law. The shopping and driving are done with his wife. And the frequency and extent of the

_____

[13]Plaintiff also argues that the ALJ's RFC assessment is inexplicably inconsistent with Dr. Enkvetchakul's conclusion that he could sit for six hours during a normal workday "given the unusual breaks." As noted by the Commissioner, however, the context of "unusual breaks" makes it clear that the prefix "un" is a typographical error. Elsewhere in his report, Dr. Enkvetchakul referred to a "normal" workday.

fishing and hunting is unexplained. The only reference to these activities is Plaintiff's wife report that he can now do neither often.

The ALJ also cited the lack of any restrictions placed on Plaintiff by his physicians. This omission is not supported by the record. After injuring his back in 2004, Plaintiff was restricted to lifting no more than fifteen pounds. Although this restriction was consistent with the demands of his current job, it is inconsistent with the ALJ's RFC assessment and with the medium[14] strength demands of a job as a gas station attendant. See DOT 915.477-010.

The final consideration detracting from Plaintiff's credibility was the lack of medical treatment during the onset of disability. Plaintiff argues that this consideration fatally disregards his records from the VAMC. Plaintiff alleged a disability onset date of January 14, 2005. His latest previous medical record is from September 2004 when he consulted Dr. Pager about neck pain. His next medical record, submitted to the Appeals Council, is from December 2005 when he consulted Dr. Birkenmeier at the VAMC about back, neck, and right shoulder pain and headaches. This fifteen month gap in medical treatment during the period when Plaintiff alleges he had to stop work because of disabling pain is a proper consideration.[15]

---

[14]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c); 416.967(c).

[15]The Court notes that Plaintiff told Dr. Birkenmeier that he had not consulted Dr. Pager for more than a year because he lost his medical insurance. This explanation is unavailing given that Plaintiff was clearly eligible for medical treatment at the VAMC.

Because two of the three factors cited by the ALJ do not support his assessment of Plaintiff's credibility, the case must be remanded for another evaluation of that credibility. Other arguments by Plaintiff might arise on remand and will, therefore, be addressed below.

Plaintiff contends that the ALJ erred by not citing his good work record as a favorable factor. An ALJ need consider, but not discuss every <u>Polaski</u> factor. **Casey v. Astrue**, 503 F.3d 687, 695 (8th Cir. 2007). Where the portions of the record referred to support a credibility determination, the ALJ need not refer to every part of that record. **Roberson**, 481 F.3d at 1026. In the instant case, the portions referred to do not support the ALJ's credibility determination. On remand, the ALJ should consider Plaintiff's favorable work record when assessing his credibility. <u>See</u> **Id.**

Plaintiff also takes issue with the ALJ's failure to specifically refer to his wife's report of his daily activities. Mrs. Russell's report mirrors her husband's statement; the only variation is her report that he can no longer often fish or hunt. "[A]n ALJ is not required to accept a statement from a witness who will benefit financially from a determination of disability, although the record in such cases generally includes some indication that the ALJ rejected the evidence for that reason." **Id.** at 1025 (internal citations omitted). The ALJ does not indicate why he rejected Mrs. Russell's report. Again, because ALJ's adverse credibility determination lacks support in the record, this omission may be addressed on remand.

Also on remand, the ALJ may address inconsistencies in the record. For instance, Mrs. Russell reported that Plaintiff could only lift five pounds; however, he later sought medical care for a hernia after lifting a propane tank. He quit work in January 2005;

however, the record does not identify any precipitating or aggravating factors that led to this decision. See **Travis v. Astrue**, 477 F.3d 1037, 1042 (8th Cir. 2007). He complained to Dr. Enkvetchakul about diminished strength in his legs making it hard for him to rise from a squatting position and then proceeded to get on and off the examination table and to rise up on his toes without assistance or difficulty. He also told Dr. Enkvetchakul that he has applied for jobs after quitting his work with the City of St. Louis. "Seeking work . . . while applying for benefits . . . [is] inconsistent with complaints of disabling pain." **Dunahoo**, 241 F.3d at 1039.

**Conclusion**

For the foregoing reasons, the ALJ's conclusion that Plaintiff could return to past relevant work as a gas station attendant is not supported by evidence on the record as a whole. The ALJ's credibility determination is also not supported by the record as a whole. Consequently, the case should be remanded for further consideration of Plaintiff's RFC, past relevant work, and credibility. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of August, 2008.